**GRUNTAL & CO., INC., Plaintiff,**

v.

**Ronald STEINBERG and Carolyn Steinberg, Defendants.**

Civ. A. No. 93–4323 (AJL).

United States District Court,
D. New Jersey.

Jan. 5, 1994.

Robert J. Kipnees, Greenbaum, Rowe, Smith, Ravin & Davis, Woodbridge, NJ, for plaintiffs.

Ronald Steinberg, Carolyn Steinberg, pro se.

## OPINION

LECHNER, District Judge.

This is an action by plaintiff Gruntal & Co., Inc. ("Gruntal") against defendants Ronald Steinberg and Carolyn Steinberg (the "Steinbergs"), for declaratory judgment as to Gruntal's obligation to arbitrate and a permanent injunction against arbitration. Jurisdiction is alleged pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and 28 U.S.C. §§ 1331 and 1332.

By opinion and order, filed 12 October 1993, an application by Gruntal for a preliminary injunction against arbitration was granted (the "Preliminary Injunction"). *See Gruntal & Co., Inc. v. Steinberg,* 837 F.Supp. 85 (D.N.J.1993) (*"Gruntal I"*). Currently before the court are the motion of the Steinbergs for summary judgment dismissing the action and vacating the Preliminary Injunction,[1] and the cross-motion of Gruntal for summary judgment granting declaratory relief and a permanent injunction against arbitration.[2] For the reasons set forth below,

---

1. The Steinbergs did not file a formal notice of motion with the Clerk of the Court. However, in light of their *pro se* status, the briefs and letters the Steinbergs submitted to chambers and to the Clerk were construed as a formal motion. Gruntal was notified of the decision in this regard by letter, dated 1 November 1993.

The Steinbergs have alternately captioned their briefs as in support of "A Request for A Summary Judgment" and a "Motion for a Summary Judgment and/or Motion to Dismiss for Failure to State A Claim." However, in their arguments, the Steinbergs refer only to a request for summary judgment. Moreover, the Steinbergs have submitted a certification in support of their motion.

"If matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 [of the Federal Rules of Civil Procedure]...." *Rose v. Bartle,* 871 F.2d 331, 340 (3d Cir.1989). Under these circumstances, the Steinbergs' motion is considered as one for summary judgment. The Steinbergs' briefs have provided adequate notice to Gruntal that their motion could be construed this way. *See id.* (conversion of Rule 12(b) motion into Rule 56 motion requires notice to parties).

2. In support of their motion and in opposition to Gruntal's cross-motion, the Steinbergs have submitted: Defendant's Brief in Support of A Request for a Summary Judgment (the "Steinberg Brief"); Response and Motion for a Summary Judgment and/or Motion to Dismiss for Failure to State A Claim (the "Steinberg Response"); Certification of Ronald Steinberg (the "Steinberg Cert."); Defendants' Brief in Opposition to Plaintiff's Cross–Motion for Summary Judgment and in Support of Defendants' Motion for Collateral Estoppel (the "Steinberg Reply Brief").

In support of its cross-motion and in opposition to the Steinbergs' motion, Gruntal submitted: Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment and/or Motion to Dismiss for Failure to State A Claim and in Support of Plaintiff's Cross–Motion for Summary Judgment (the "Gruntal Brief"); Plaintiff's Statement Pursuant to General Rule 12 G (the "Gruntal 12G"); Certification of David Rappaport (the "Rappaport Cert."); Certification of Katharine Nathan (the "Nathan Cert."); Letter–Brief, dated 24 November 1993 (the "Gruntal Reply Letter"); Further Certification of Katharine Nathan (the "Nathan Supp. Cert.").

In support of its prior application for a preliminary injunction, Gruntal submitted: Complaint, filed 29 September 1993 (the "Complaint"); Certification of David Rappaport (the "Rappaport PI Cert."). The Steinbergs did not submit papers or otherwise appear in response to the Gruntal preliminary injunction application.

the Steinbergs' motion is denied, but the Preliminary Injunction is vacated for cause shown; Gruntal's cross-motion is denied.

*Procedural History*

In or about April to May 1993, the Steinbergs initiated two separate arbitration proceedings (collectively, the "Arbitration Proceedings") against Gruntal before the National Association of Securities Dealers ("NASD"). The Arbitration Proceedings were assigned NASD Case Numbers 93–01699 and 93–01887. Complaint, Ex. B; Rappaport PI Cert., ¶ 5.

Gruntal subsequently moved before the NASD to dismiss the Arbitration Proceedings on the ground that "Gruntal never entered into any contract or agreement of any nature with the [Steinbergs] to arbitrate any dispute before the NASD, or indeed before any other arbitration forum." Rappaport PI Cert., ¶ 6. By memorandum, dated 10 September 1993, the NASD declined to rule on Gruntal's motion to dismiss and referred the question of arbitrability to the arbitration panel. Steinberg Response, Ex. C.

Gruntal filed this action on 29 September 1993. The Complaint seeks "a [d]eclaratory [j]udgment declaring that Gruntal has no obligation to [the Steinbergs] to arbitrate the claims raised by the [Steinbergs] in the Arbitration Proceedings." Complaint, ¶ 21. The Complaint further seeks a preliminary and permanent injunction enjoining the Steinbergs from "pursuing their claims in the Arbitration Proceedings." *Id.,* ¶ 26.

Also on 29 September 1993, Gruntal made application for an order to show cause why a preliminary injunction should not issue, enjoining the Steinbergs from pursuing the Arbitration Proceedings against Gruntal pending the outcome of this case on the merits (the "Order to Show Cause"). The requested Order to Show Cause was entered on the same date.

The Steinbergs failed to respond to the Order to Show Cause, either by appearance or by written submission. In light of this,

and for good cause shown by Gruntal, the Arbitration Proceedings were enjoined pending outcome of the case on the merits. *See Gruntal I,* 837 F.Supp. 85. The instant motions followed.

*Facts*

Gruntal is, and has at all relevant times been, a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York. Complaint, filed 29 September 1993 ("Complaint"), ¶ 1. Gruntal is a securities broker-dealer and a member of the National Association of Securities Dealers ("NASD"). Rappaport PI Cert., ¶ 2. Gruntal maintains a branch office in Fort Lee, New Jersey. Complaint, ¶ 2.

The Steinbergs are individuals residing in Baltimore County, Maryland. It is alleged the Steinbergs are "citizens of the State of Maryland." *Id.,* ¶ 3.

From November 1982 until at least December 1988, the Steinbergs held a securities trading account through account executives Bob Semon and Todd Semon, who did business out of a securities brokerage office located in Fort Lee, New Jersey (the "Fort Lee Office").[3] Steinberg Cert., ¶ 1. Until about April 1988, Bob Semon and Todd Semon were employed by the securities brokerage firm of Philips, Appel & Walden ("Philips"), which until that time owned and operated the Fort Lee Office. *Id.;* Rappaport PI Cert., ¶ 2. It appears that while the Steinbergs were customers of Philips, Philips was a member of the NASD. Steinberg Cert., ¶ 1. During that period, Philips had numerous other branch offices.[4] Rappaport PI Cert., ¶ 3.

On or about 18 April 1988, Gruntal entered into an agreement (the "Asset Purchase Agreement") with Philips by which Gruntal "agreed to purchase certain specified assets of Philips' [Fort Lee Office]." *Id.;* Complaint, Ex. A. The Asset Purchase Agreement transferred to Gruntal "[a]ll right, title and interest of [Philips] in and to the furni-

---

**3.** There is strong indication that the Steinbergs held a trading account at the Fort Lee Office through Bob Semon and Todd Semon as late as November 1990. *See infra* note 7.

**4.** No further facts are alleged as to the citizenship or operations of Philips.

ture, leasehold improvements, equipment, machinery, supplies and other assets owned by [Philips] which are presently located or used at the [Fort Lee Office]." Complaint, Ex. A, ¶ 1(a).

The Asset Purchase Agreement also transferred to Gruntal the "[g]oodwill, other intangible assets and written information and operating data possessed by [Philips] relating to the retail brokerage business presently conducted by [Philips] at the [Fort Lee] Office...." Id., ¶ 1(b) Gruntal, however, acquired "no rights or interest in or to the name 'Philips, Appel & Walden.'" Id.

Also by the Asset Purchase Agreement, Gruntal acquired "any and all security and other deposits with respect to the [l]ease for the [Fort Lee] Office, ... and all other assets and properties of every kind and description and wherever located, relating to the conduct of the retail brokerage business at the [Fort Lee] Office." Id., ¶ 1(c).

Pursuant to the Asset Purchase Agreement, Gruntal "shall not assume any liabilities or obligations of [Philips] of any kind or nature whatsoever, except those liabilities and obligations commencing as of [19 April 1993, the closing date of the Asset Purchase Agreement (the "Closing Date")] under the [l]ease [for the Fort Lee Office]." Id., ¶ 2. Philips remains responsible for "all obligations, claims, demands, causes of action, proceedings, losses, damages, expenses, liabilities, fines, penalties, deficiencies and costs ... existing on the Closing Date or arising as a result of or in connection with the business or activities of [Philips] at the [Fort Lee] Office prior to the Closing Date." Id.

Gruntal, on the other hand, is liable only for claims "insofar as such [c]laim arises out of or relates to (i) the conduct of [Gruntal's] business or operations at the [Fort Lee] Office after the Closing Date, or (ii) the inaccuracy of any representation or the breach of any warranty, covenant or agreement of [Gruntal] contained in [the Asset Purchase Agreement]." Id., ¶ 11(b).

The Asset Purchase Agreement also provided for the "carrying and clearing of certain customer accounts." Id., ¶ 8(b). The provision states, in relevant part:

For a period of 90 days after the Closing Date, [Philips] will use its best efforts to cause the retail brokerage customers of those registered representatives at the [Fort Lee] Office who accept employment with [Gruntal] *to transfer their accounts to [Gruntal] as of the Closing Date,* and [Philips] and [Gruntal] shall cooperate to facilitate the transfer of such accounts to [Gruntal]. [Gruntal] shall have the right, to be exercised at any time or from time to time but not later than 5 business days after the conversion of customer accounts of the [Fort Lee] Office ..., to reject any and all accounts of customers serviced at the [Fort Lee] Office which as of the Closing Date ... (i) have an unsecured or partially secured debit balance, or (ii) are ... not acceptable to [Gruntal], in its sole discretion. [Philips] shall arrange for the carrying and clearing of such rejected accounts, and shall remain responsible therefor. Anything herein contained to the contrary notwithstanding, ... [Philips] shall retain all rights to any income earned and shall remain responsible for all costs incurred ... as a result of trades executed or insurance policies sold on or prior to the Closing Date....

Id. (emphasis added).

Under the Asset Purchase Agreement, Philips

constitutes and appoints [Gruntal] ... as the true and lawful attorneys of [Philips], with full power of substitution, in its name, but on behalf of and for the benefit of [Gruntal] ... for those customer accounts which are transferred to [Gruntal] and retained by [Gruntal] pursuant to Section 8 hereof....

Id., ¶ 14(a). Moreover, effective as of the Closing date, [Gruntal] has the right to "receive and open all mail, packages and other communications addressed to [Philips] and relating to the retail brokerage business of the [Fort Lee] Office...." [5] Id., ¶ 14(b).

5. Gruntal is also obligated to "preserve and keep all financial and other records of [Philips] which are transferred to [Gruntal] pursuant to this Agreement." Complaint, Ex. A, ¶ 12(a).

The Asset Purchase Agreement is "governed by and construed in accordance with the laws of the State of New York applicable to contracts performed wholly within such state, except to the extent (if any) such laws may be superseded by Federal laws." *Id.*, ¶ 15(g).

As stated, prior to the Closing Date, the Steinbergs held a trading account with Philips through Bob Semon and Todd Semon (the "Philips Account"). Steinberg Cert., ¶ 1; Rappaport PI Cert., ¶ 2. It appears the number identifying the Philips Account is 39818442. Complaint, Ex. B. The Philips Account appears to have been created by "a contract, requiring arbitration of disputes, ... between [the Steinbergs] and [Philips (the "Steinberg–Philips Contract") ]." Steinberg Cert., ¶ 2. It further appears that, at least as of 30 November 1990, the Steinbergs held a trading account with Gruntal through Bob Semon and Todd Semon [6] (the "Gruntal Account"). Steinberg Response, Ex. E, F.[7]

> The Steinbergs state that Gruntal is in possession of documents relating to their account with Philips. *See* Steinberg Brief at 4; Steinberg Response at 7, Steinberg Cert., ¶ 10. Gruntal, however, certifies that in July 1993 and October 1993, an internal search was conducted "for documents relating to the Steinbergs." Rapport Cert., ¶ 3. The search revealed that "Gruntal is in possession of no documents that relate to the Steinbergs or their claims in the Arbitration Proceedings." *Id.*, ¶ 4.

**6.** The Steinbergs state, and Gruntal does not appear to contest, that "both Robert [Semon] and Todd Semon ... accepted employment with [Gruntal]." Steinberg Response at 4.

**7.** Exhibit E to the Steinberg Response ("Exhibit E") is a document entitled "Account Portfolio," and appears to be for the period of 27 October 1990 to 30 November 1990. Exhibit E lists the Steinbergs as account holders, and is captioned with the statement: "Through the courtesy of: Philips, Appel & Walden, Inc. *eff 4–20–88 thru the courtesy of Gruntal & Co. 185 Bridge Plaza North—Fort Lee, N.J.*" (emphasis added). Under the heading, "Account #," Exhibit E lists the number 39822321. Exhibit E lists an opening balance of $150.94 and a closing balance of $0.00.

Exhibit F to the Steinberg Response ("Exhibit F") is a document, resembling a statement of account, emblazoned with Gruntal's name and logo, in oversize type, centered at the top. In the top left corner, Exhibit F lists the Steinbergs

It appears the number identifying the Gruntal Account is 39822321. *Id.*

Neither party has alleged that a new contract was signed by the Steinbergs and Gruntal after the Closing Date in order to initiate the Gruntal Account. Moreover, neither party has alleged Gruntal rejected the Philips Account and the Steinberg–Philips Contract, as would have been its right under the Asset Purchase Agreement.[8] *See* Asset Purchase Agreement, ¶ 8(b). Ronald Steinberg in fact certifies:

> In April 1988, I learned that the name of the [Fort Lee O]ffice was changed only because a name change appeared on my monthly statement (from Philips et al. to Gruntal et al.).
>
> Inasmuch as *I was never requested to sign a new contract* when the name changed, I assumed, In good faith, that the existing contract [relating to the Philips Account] remained continuously in force....

above the caption: "Special Acct." Under the heading, "Account Number," Exhibit F lists the number 398–22321. Under the heading "Account Executive," Exhibit F lists "Robert & Todd Semon." Exhibit F purports to be for the period ending 29 July 1988.

In applying for the Preliminary Injunction, Gruntal, by its assistant general counsel, certified that the Steinbergs held a securities trading account with Philips "through March 1988." Rappaport PI Cert., ¶ 3. Gruntal did not state what became of the Steinbergs' account upon execution of the Asset Purchase Agreement, and did not even suggest that the Steinbergs continued to hold an account with Gruntal through Bob Semon and Todd Semon after the Closing Date.

Gruntal states, and the Steinbergs appear to concede, that the Steinbergs "did not initiate any trades with Gruntal." Gruntal Brief at 11; *see* Steinberg Response at 3. However, in Exhibit F, listed under the heading "Sold or Delivered Short," is the description: "6500 WTS Airship International Ltd." It is not clear that this listing designates a trade, but it at least brings into question Gruntal's statement that no trading was carried out by the Steinbergs through Gruntal.

**8.** Gruntal only states in conclusory fashion: "[T]here is no indication that [the Philips Account] was transferred, Exhibit E and F to the [Steinberg] Response notwithstanding." Gruntal Brief at 11. This statement constitutes Gruntal's sole response to the evidence contained in Exhibit E and Exhibit F.

Steinberg Cert., ¶¶ 5–6.[9]

As stated, the Steinbergs initiated the Arbitration Proceedings by submitting two statements of claim to the NASD in April and May 1993. The first statement of claim, dated 20 April 1993 (the "20 April Statement of Claim") alleges certain improprieties and breaches of duty by Todd Semon and Bob Semon, as well as by Philips itself. Complaint, Ex. B. According to the 20 April Statement of Claim, the alleged breaches of duty occurred between 21 October 1987 and approximately the end of November 1987. *Id.* At that time, both Bob Semon and Todd Semon were employed by Philips. *Id.* The 20 April Statement of Claim alleges that Todd Semon worked for Gruntal. *Id.* The 20 April Statement of Claim requests damages totalling $44,486.00. *Id.*

The second statement of claim, dated 7 May 1993 (the "7 May Statement of Claim"), alleges certain improprieties and breaches of duty by Bob Semon. *Id.* These breaches were alleged to have occurred between 18 October 1987 and 15 February 1988. *Id.* At that time, Bob Semon was employed by Philips. *Id.* The 7 May Statement of Claim alleges that both Bob Semon and Todd Semon were employed by Gruntal. *Id.* The 7 May Statement of Claim requests damages totalling $17,300.00. *Id.*

Both the 20 April Statement of Claim and the 7 May Statement of Claim allege that "preliminary" copies thereof were "personally delivered to Michael Pulver, the local attorney for Gruntal." *Id.* According to the 20 April Statement of Claim and the 7 May Statement of Claim, Gruntal did not respond to these communications. *Id.* Gruntal, however, states that it made clear to both the Steinbergs and the NASD "that Gruntal never entered into any contract or agreement of any nature with the [Steinbergs] to arbitrate any dispute before the NASD, or indeed before any other arbitration forum." Rappaport PI Cert., ¶ 6. Gruntal states it presented the Asset Purchase Agreement to both the Steinbergs and the NASD, and requested that the arbitration claims be dismissed. *Id.* When neither the Steinbergs nor the NASD acquiesced to this demand, Gruntal initiated the instant proceedings.

Apparently, the Arbitration Proceedings which are the subject of the instant action are not the first instance of arbitration between the Steinbergs and Gruntal. Since the grant of the Preliminary Injunction, it has come to light that in or about December 1989, Gruntal was named as a defendant in an NASD arbitration proceeding originally filed by the Steinbergs against Philips, bearing the number 88–02248 (the "Prior Arbitration Proceedings"). Nathan Cert., Ex. B. In the Prior Arbitration Proceedings, the Steinbergs complained that Philips improperly failed to execute a sell order, damaging the Steinbergs in the amount of $4,875.00. Steinberg Response, Ex. A.

The Prior Arbitration Proceedings were carried out in accordance with the rules for "Simplified Arbitration," provided in section 13 of the NASD Code of Arbitration Procedure. Steinberg Response, Ex. A at 1. As such, Gruntal states it "was not afforded the opportunity to present witnesses in support of its defense . . . [or] to present oral argument." Nathan Cert., ¶ 8. The Steinbergs state that in the Prior Arbitration Proceedings, Gruntal "refused to cooperate and/or

---

9. The parties have submitted scant evidence as to what became of Philips subsequent to the Closing Date. There is some indication, however, that Philips ceased to do business shortly after the Closing Date:

> By letter, dated 5 December 1990, the Securities and Exchange Commission ("SEC") responded to Ronald Steinberg's request regarding the status of Philips and Gruntal. *See* Steinberg Reply Brief, Ex. B. The SEC stated:
>> According to information contained in our public files, Philips . . . filed [a] Form BDW on July 13, 1988. . . . A Form BDW serves as notice of withdrawal of registration as a broker-dealer. . . .
>> If you are in need of information relating to successive relationships between these firms, you may wish to contact the state securities administrator's offices in the firms' respective states of incorporation. . . .
>
> *Id.*
>
> The only other piece of evidence in the record concerning the status of Philips subsequent to the Closing Date is contained in the answer of Todd Semon in the Arbitration Proceedings. Todd Semon alleged that Philips "ceased business operations in 1988. . . ." Steinberg Brief, Ex. A.

defend the complaint on the merits." Steinberg Response at 5.

By Notice of Arbitration Award, Dated 11 June 1990, Gruntal was held liable to the Steinbergs, "as successor to Philips," in the amount of $4,875 (the "Prior Arbitration Award"). Steinberg Response, Ex. A at 2. When the Steinbergs attempted to have the Prior Arbitration Award confirmed in Maryland state court, their complaint was dismissed for lack of jurisdiction. Nathan Cert., Ex. F. As such, it appears the Prior Arbitration Award was never judicially confirmed. *Id.;* Steinberg Reply Brief at 5. It appears, however, that on 16 March 1992, Gruntal sent the Steinbergs a check in the amount of $916.00, which Gruntal described as "the sum of the $100.00 filing fee plus interest on $4,975.00 (the sum of the award plus filing fee, multiplied by Maryland statutory rate of 10% per annum simple interest for the period from June 11, 1990 through February 3, 1992)." Steinberg Response, Ex. B.[10]

*Discussion*

A. *Gruntal's Motion for Summary Judgment*

Gruntal seeks summary judgment permanently enjoining the Arbitration Proceedings, and declaring it free of obligation to arbitrate with the Steinbergs.

1. *Summary Judgment Standard of Review*

■ To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("The thresh-

old inquiry is whether there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" (citations omitted); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992) ("We apply the test ... (1) Is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?") (quotations omitted); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) ("[S]ummary judgment is inappropriate when a conflict on a material fact is present in the record."); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir. 1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.").

■ All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County,* 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Center,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989). " 'Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.'" *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party

---

10. The Steinbergs also allude to an action or actions by them against Gruntal in "Federal Circuit Court." Steinberg Reply Brief at 7; Steinberg Response at 6. The Steinbergs, however, have not submitted any evidence, documentary or testimonial, of a Federal action between themselves and Gruntal. Gruntal does not address the Steinbergs' contention in this regard.

must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted).

█ Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *see* Fed.R.Civ.P. 56(e); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of movant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the nonmoving party fails to 'establish the existence' of an element essential to the case").

Accordingly, in order to prevail in its motion, Gruntal must establish there is no genuine issue of material fact that it is entitled to a permanent injunction against the Arbitration Proceedings, and to a declaration that it is free from obligation to arbitrate with the Steinbergs.

█ In order to prevail on its request for a permanent injunction, Gruntal must fulfill four requirements, the first of which is to establish actual success on the merits of its claim.[11] *See Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987); *CIBA–GEIGY Corp. v. Bolar Pharmaceutical Co., Inc.,* 747 F.2d 844, 848 (3d Cir.1984); *Public Interest Research Group v. Star Enterprise,* 771 F.Supp. 655, 669 (D.N.J.1991). More specifically, Gruntal must establish that it is not obligated to arbitrate with the Stein-

---

11. The other three requirements for a permanent injunction are identical to three of the requirements for a preliminary injunction. *See Amoco Production Co.,* 480 U.S. at 546 n. 12, 107 S.Ct. at 1404 n. 12; *Star Enterprise,* 771 F.Supp. at 669. These are: the probability of irreparable injury in the absence of relief; the possibility of harm to the non-moving party if relief were granted; and the public interest. *See Alessi v. Pennsylvania Dept. of Public Welfare,* 893 F.2d 1444, 1447 (3d Cir.1990) (discussing require-

ments for preliminary injunction); *see also Natural Resources Defense Council v. Texaco,* 906 F.2d 934, 941 (3d Cir.1990) (discussing requirements for permanent injunction). These remaining requirements were discussed in detail in *Gruntal I. See* 837 F.Supp. at 87–88. It is not necessary to reach these requirements in deciding the instant motion because Gruntal has not established actual success on the merits, and for that reason alone is not entitled to a permanent injunction.

bergs in the Arbitration Proceedings. Obviously, the same showing would be required for Gruntal to obtain the judicial declaration it seeks. Therefore, in order to be granted the relief it seeks on summary judgment, Gruntal must establish there is no genuine issue of material fact that it is not bound to arbitrate with the Steinbergs in the Arbitration Proceedings.

■ Arbitrability disputes connected with a transaction involving interstate commerce are governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (the "FAA"). *Paine-Webber, Inc. v. Hartmann*, 921 F.2d 507, 510 (3d Cir.1990); *see Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) ("Federal law in the terms of the [FAA] governs [the issue of arbitrability] in either state or [F]ederal court."). The transactions at issue in the Arbitration Proceedings were carried out by telephone between the Steinbergs, residents of Maryland, and the Fort Lee Office, located in New Jersey. *See* Complaint, ¶ 3; *id.*, Ex. B. Because the instant dispute is connected with transactions involving interstate commerce, the issue of arbitrability is governed by the FAA. *See PaineWebber*, 921 F.2d at 510.

"In enacting [the FAA], Congress declared a strong national policy favoring arbitration...." *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984). "The [FAA] establishes that, as a matter of [F]ederal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Memorial Hospital*, 460 U.S. at 24–25, 103 S.Ct. at 941.

Notwithstanding this policy favoring arbitration, "the FAA does not require parties to arbitrate when they have not agreed to do so...." *Volt Information Sciences v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989). As the Supreme Court has stated: "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration [in] any dispute which he has not agreed so to submit." *AT & T Technologies v. Communications Workers of America*, 475 U.S. 643, 648,

106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *see PaineWebber, Inc. v. Hofmann*, 984 F.2d 1372, 1381 (3d Cir.1993) ("[A]rbitration is a matter of contract, so no party should be forced to arbitrate a claim it never agreed to submit to arbitration."); *Morristown Daily Record v. Graphic Communications Union, Local 8N*, 832 F.2d 31, 33 (3d Cir.1987) ("[T]he arbitrators derive their authority from the parties' voluntary agreement.").

"Before compelling an unwilling party to arbitrate, [the FAA] requires the court to engage in a limited review to ensure that the dispute is arbitrable—i.e., *that a valid agreement to arbitrate exists between the parties* and that the specific dispute falls within the substantive scope of that agreement..... If a court determines that a valid arbitration agreement does not exist ... it is obliged to enjoin arbitration." *PaineWebber*, 921 F.2d at 511 (emphasis supplied).

■ In *Gruntal I*, it was held that Gruntal had established a reasonable probability that it was free from any obligation to arbitrate in the Arbitration Proceedings. The basis of this holding was the representation by Gruntal that Gruntal was not party to a contract of any nature with the Steinbergs. *See Gruntal I*, 837 F.Supp. at 90 (citing Rappaport PI Cert., ¶ 6). Indeed, Gruntal gave no indication it ever conducted business with the Steinbergs. *Id.* However, since the grant of the Preliminary Injunction in *Gruntal I*, certain facts have come to light which cast doubt on the representations of Gruntal with respect to its relationship with the Steinbergs.

A successor to or assignee of a contract containing an arbitration clause may be obligated to arbitrate pursuant to that arbitration clause. *See Wheat, First Securities, Inc. v. Green*, 993 F.2d 814, 821 (11th Cir.1993) (acknowledging that purchaser of securities trading office may be obligated to arbitrate with customers of seller if purchaser was "successor-in-interest" to seller, but finding no successor relationship); *Cheshire Place Associates v. West of England Ship Owners Mutual Insurance Association*, 815 F.Supp. 593, 597 (E.D.N.Y.1993) (insured bound to arbitrate with insurer under insurance contract "whether [insured] acquired rights un-

der [insurance] contract as agent, third-party beneficiary, or assignee"); *Cargill B.V. v. S/S Ocean Traveller,* 726 F.Supp. 56, 62 (S.D.N.Y.1989) (assignee of bill of lading obligated to arbitrate under bill of lading's arbitration clause); *Banque de Paris et des Pays–Bas v. Amoco Oil Co.,* 573 F.Supp. 1464, 1466 (S.D.N.Y.1983) ("Normally, the assignee is bound to arbitrate all disputes, if that is the remedial mechanism agreed upon by the assignor."); *cf. I.S. Joseph Co., Inc. v. Michigan Sugar Co.,* 803 F.2d 396, 400 (8th Cir.1986) (assuming valid assignment, assignee could enforce arbitration provision in contract entered into by assignor); *Hart Planners & Architects v. Evergreen, Ltd.,* 787 F.Supp. 753, 756 (S.D.Ohio 1992) (assignee could enforce assignor's right to arbitrate under contract).

In *Gruntal I,* based on Gruntal's representations, the issue of whether Gruntal was a successor to or assignee of the Steinberg–Philips Contract was not addressed. However, based on evidence now submitted by the Steinbergs, there appears to be at least a genuine issue of material fact as to whether Gruntal may be obligated to arbitrate as a successor to or assignee of the Steinberg–Philips Contract.

The Steinbergs maintained the Philips Account through the Closing Date, 19 April 1988. It appears the Steinbergs maintained an account with Gruntal as early as July 1988 and as recently as November 1990. Steinberg Response, Ex. E, F. There is in fact some indication that the Gruntal Account was initiated as early as 20 April 1988, the day after the Closing Date. Steinberg Response, Ex. E ("Through the courtesy of: Philips, Appel & Walden, Inc. *eff 4–20–88 thru the courtesy of Gruntal & Co.* ..." (emphasis added)).

While the numbers identifying the two accounts are different, the Gruntal Account and the Philips Account appear to have been handled by the same account executives, Bob Semon and Todd Semon. *See* Complaint, Ex. B; Steinberg Response, Ex. F. Ronald Steinberg moreover certifies that he was not asked by Gruntal to sign a new contract in connection with the Gruntal Account, and learned of the transfer of the Fort Lee Office "only because a name change appeared on [his] monthly statement." Steinberg Cert., ¶¶ 5–6.

Under these facts, it appears the Philips Account may have been transferred or assigned to Gruntal by Philips in connection with the Asset Purchase Agreement, and that the Gruntal Account is merely a continuation of the Philips Account. For the same reasons, it appears the Steinberg–Philips Contract may have been similarly transferred or assigned to Gruntal. If this is so, Gruntal may be compelled to arbitrate with the Steinbergs pursuant to the arbitration clause in the Steinberg–Philips Contract. *See Cheshire Place Associates,* 815 F.Supp. at 597; *Cargill B.V.,* 726 F.Supp. at 62; *Banque de Paris et des Pays–Bas,* 573 F.Supp. at 1466.

The possibility that the Philips Account and the Steinberg–Philips Contract were transferred or assigned to Gruntal is, moreover, consistent with the terms of the Asset Purchase Agreement. As stated, the Asset Purchase Agreement contains a provision whereby Philips and Gruntal would cooperate "to cause the retail brokerage customers of those registered representatives at the [Fort Lee] Office who accept employment with [Gruntal] to transfer their accounts to Gruntal as of the Closing Date...." Complaint, Ex. A, ¶ 8(b).

As mentioned, it appears Bob Semon and Todd Semon did accept employment with Gruntal, and that the Gruntal Account was initiated as early as the day after the Closing Date. Steinberg Response, Ex. E, F. Under these facts, there is a distinct possibility that the Gruntal Account was a result of the account transfer provisions of the Asset Purchase Agreement. If this were so, it appears the Steinberg–Philips Contract would control the rights of the parties to the Gruntal Account, and would obligate Gruntal to arbitrate with the Steinbergs pursuant to its arbitration clause. *See Cheshire Place Associates,* 815 F.Supp. at 597; *Cargill B.V.,* 726 F.Supp. at 62; *Banque de Paris et des Pays–Bas,* 573 F.Supp. at 1466.

Gruntal does little to rebut the Steinbergs' contention that Gruntal is the successor to or

assignee of the Steinberg–Philips Contract. Gruntal first points to the legal proposition "that a mere sale of corporate property by one company to another does not make the purchaser liable for the liabilities of the seller *not assumed by it.*" Gruntal Brief at 7 (emphasis added). Gruntal appears to accurately state the law in this regard. *See Schumacher v. Richards Shear Co., Inc.,* 59 N.Y.2d 239, 245, 464 N.Y.S.2d 437, 451 N.E.2d 195 (1983). However, under the facts now at bar, it appears Gruntal may in fact have assumed the Steinberg–Philips Contract, and the obligation to arbitrate. Therefore, Gruntal's contention, while legally accurate, is inapposite to the instant facts. *See Schumacher,* 59 N.Y.2d at 244, 464 N.Y.S.2d 437, 451 N.E.2d 195 (successor corporation may be liable for obligations of predecessor if obligations expressly or impliedly assumed).

Gruntal further points to provisions of the Asset Purchase Agreement limiting its liability for trades and other actions of Philips carried out on or before the Closing Date. *See* Gruntal Brief at 8, 11 (citing Complaint, Ex. A, ¶¶ 2, 8(b)(i)). Again, Gruntal's argument is inapposite. The provisions cited by Gruntal may bear on Gruntal's tort liability for the actions of Philips. That issue, however, is not currently at bar. The sole issue at bar is the existence *vel non* of an agreement to arbitrate between Gruntal and the Steinbergs. As stated, under the facts at bar, there is at least a genuine issue of material fact as to whether such an agreement exists.

Gruntal's sole argument bearing on whether the Steinberg–Philips Contract was in fact transferred to them is that the Steinbergs "readily admit that they did not initiate any trades with Gruntal." [12] Gruntal Brief at 11. While this fact may bear on the existence of a contract between Gruntal and the Steinbergs, it by no means conclusively establishes the absence of such a contract. Gruntal does not cite, and there does not appear to be, any reason that the initiation of trades is necessary to a finding that a contract existed between Gruntal and the Steinbergs. This is

especially so in light of the documentary evidence that such a contract did in fact exist. Steinberg Response, Ex. E, F.

There exists a genuine issue of material fact as to whether Gruntal is the successor to or assignee of the Steinberg–Philips Contract and its arbitration clause. As such, there is a genuine issue of material fact as to whether Gruntal is obligated to arbitrate with the Steinbergs in the Arbitration Proceedings. Accordingly, Gruntal's motion for summary judgment is denied; a permanent injunction against arbitration will not issue pursuant to Gruntal's instant motion.

### B. *The Steinbergs' Motion for Summary Judgment*

In order to prevail in their motion for summary judgment, the Steinbergs must establish that there exists no genuine issue of material fact that Gruntal is obligated to arbitrate in the Arbitration Proceedings. While the Steinbergs have submitted evidence sufficient to defeat Gruntal's motion, they have not carried their burden on summary judgment.

As stated, the linchpin of any arbitrability issue is the existence of an agreement to arbitrate. *See AT & T Technologies,* 475 U.S. at 648, 106 S.Ct. at 1418. The Steinbergs argue that two sources exist for such an agreement: "A specific agreement by virtue of the purchase of the Steinberg[–Philips] [C]ontract [and] [a]n implied agreement by virtue of the NASD Code of Arbitration Procedure." Steinberg Reply Brief at 3.

#### 1. *Purchase of Steinberg–Philips Contract by Gruntal*

■ As stated, the Steinbergs have created a genuine issue of material fact as to whether the Steinberg–Philips Contract was transferred or assigned to Gruntal. However, the Steinbergs have failed to establish, beyond a genuine issue of material fact, that such a transfer or assignment did take place.

---

12. Gruntal's factual contention in this regard appears at least controverted by the documentary evidence. As stated, under the heading "Sold or Delivered Short," Exhibit F contains the description: "6500 WTS Airship International Ltd."

Steinberg Response, Ex. F. This listing does not conclusively designate a trade, but it at least brings into question Gruntal's statement that no trading was carried out by the Steinbergs through Gruntal.

For example, the Steinbergs point to the existence of the Gruntal Account, but cite no facts which would establish that the account was necessarily a continuation of the Philips Account.[13] Steinberg Response at 3, 8. Similarly, the Steinbergs point to the provision of the Asset Purchase Agreement under which the Philips Account *could have* been transferred to Gruntal, but cite no conclusive evidence that the Philips Account was actually so transferred.[14] *Id.* at 4.

In arguing Gruntal succeeded to the Steinberg–Philips Contract, the Steinbergs state Gruntal is in possession of the records relating to the Philips Account. *See* Steinberg Brief at 4; Steinberg Response at 7, Steinberg Cert., ¶ 10. The Steinbergs cite Gruntal's contractual obligation under the Asset Purchase Agreement to keep and preserve Philips' records. *See* Steinberg Response at 7 (citing ¶ 12(a) of Asset Purchase Agreement, Complaint, Ex. A, ¶ 12(a)). The Steinbergs have not cited any rationale to suggest that Gruntal's mere possession of documents relating to the Philips Account requires a finding that they are bound by Steinberg–Philips Contract.

The Steinbergs have, moreover, failed to refer to any evidence that Gruntal is in possession of documents relating to the Philips Account.[15] Moreover, Gruntal has certified that, after two recent internal searches, "no documents that relate to the Steinbergs or their claims in the Arbitration Proceedings" were found.[16] Rappaport Cert., ¶ 4.

■ The Steinbergs also argue that this court is bound by the doctrine of issue preclusion to find that Gruntal is the successor to Philips' obligations under the Steinberg–Philips Contract. To this end, the Steinbergs point to the Prior Arbitration Award, which held Gruntal liable "as successor to Philips....." Steinberg Response, Ex. A at 2.

The doctrine of issue preclusion [17] "embodies the principle that 'later courts should honor the first actual decision of a matter that has actually been heard and litigated.'" *Rider v. Pennsylvania,* 850 F.2d 982, 989 (3d Cir.) (quoting C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4416 at 136 (1981)), *cert. denied,* 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 582 (1988). "By precluding a court from making a second determination as to an issue on which an

13. Indeed, the Steinbergs do not appear to have conducted any formal discovery into the successive relationship between Philips and Gruntal. This is in spite of the SEC's having advised the Steinbergs as to potential sources of information on such relationship. *See* Steinberg Reply Brief, Ex. B (quoted *supra* note 9).

The Steinbergs have a right to continue to proceed without an attorney, if they deem it appropriate. However, in light of the Steinbergs' failure to expedite this litigation by conducting what appear to be relatively simple factual inquiries, it may be advisable to retain counsel.

14. In fact, the Steinbergs have not even submitted a copy of the Steinberg–Philips Contract. Therefore, the existence and scope of the cited arbitration clause cannot be determined.

15. The Steinbergs submitted an account statement, dated 30 October 1987, apparently relating to the Philips Account. *See* Steinberg Brief, Ex. A. The Steinbergs argue that this statement proves "that the records [relating to the Philips Account] still exist." Steinberg Brief at 4. The Steinbergs do not argue, and it does not appear, that the document submitted proves or even suggests that Gruntal is in possession of documents relating to the Philips Account.

16. Faced with Gruntal's denial, the Steinbergs do not persist in their contention that Gruntal possesses documents relating to the Philips Account. Rather, the Steinbergs state that Gruntal was negligent in maintaining the Steinbergs' documents and in failing to forward certain correspondence to Philips. *See* Steinberg Reply Brief at 4, 5–6. The negligence *vel non* of Gruntal in any respect is not the subject of the instant action. Accordingly, this issue will not be addressed.

17. "To reduce the confusion that resulted from the interchangeable use of [the terms, *res judicata* and collateral estoppel], the courts have refined the nomenclature used in the preclusion doctrine." *Gregory v. Chehi,* 843 F.2d 111, 115 (3d Cir.1988) (citing *Wade v. City of Pittsburgh,* 765 F.2d 405, 408 (3d Cir.1985)). The term 'issue preclusion' has in modern parlance replaced collateral estoppel. *See Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 189 (3d Cir.1993); *Electro–Miniatures Corp. v. Wendon Co.,* 889 F.2d 41, 44 (3d Cir.1989); *Gregory,* 843 F.2d at 115–116; *Pittman v. LaFontaine,* 756 F.Supp. 834, 841 (D.N.J.1991).

earlier court has previously rendered a decision, the doctrine of issue preclusion assists in the 'maintenance of the social order' and 'secure[s] the peace and repose of society by the settlement of matters capable of judicial determination.'" *Id.* (quoting *Southern Pacific Railroad v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)).

■ Issue preclusion "precludes the relitigation of an issue that has been put in issue and directly determined adversely to the party against whom the estoppel is asserted." *Melikian v. Corradetti,* 791 F.2d 274, 277 (3d Cir.1986) (citing *New Jersey–Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education,* 654 F.2d 868, 876 (3d Cir.1981)); *State v. Gonzalez,* 75 N.J. 181, 380 A.2d 1128 (1977). Issue preclusion does not extend to collateral issues nor to matters inferred from the judgment. *Id.* The doctrine of issue preclusion may be invoked where:

(1) the identical issue was decided in a prior adjudication;

(2) there was a final judgment on the merits;

(3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and

(4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question [in the prior matter].

*Board of Trustees of Trucking Employees of New Jersey Welfare Fund, Inc. v. Centra,* 983 F.2d 495, 505 (3d Cir.1992) (citing *Temple University v. White,* 941 F.2d 201, 212 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992)); *see Gregory,* 843 F.2d at 121. The issue must have been "'distinctly put in issue' and 'directly determined' adversely to the party against which the estoppel is asserted." *New Jersey–Philadelphia Presbytery,* 654 F.2d at 876 (quoting *City of Plainfield v. Public Service Electric and Gas,* 82 N.J. 245, 257–58, 412 A.2d 759 (1980)).

Turning to the facts at bar, it does not appear from the present record that Gruntal was afforded a full and fair opportunity to litigate the issue of their successive relationship with Philips in the Prior Arbitration Proceeding. Gruntal states, and the Steinbergs do not dispute, that it was not allowed to present testimonial evidence or oral argument in the Prior Arbitration Proceedings. Nathan Cert., ¶ 8. The Steinbergs moreover acknowledge that Gruntal did not "defend the complaint [in the Prior Arbitration Proceedings] on the merits." Steinberg Response at 5. Based on the present record, this lack of opportunity for Gruntal to fully litigate the issue of successor/assignee liability in the Prior Arbitration Proceedings would cause the application of issue preclusion in the instant proceeding to be manifestly unfair. *See Centra,* 983 F.2d at 505; *Nogue v. Estate of Santiago,* 224 N.J.Super. 383, 387, 540 A.2d 889 (App.Div.1988) ("valid and final" arbitration award to be accorded issue preclusive effect "only insofar as the proceeding resulting in the determination entailed the essential elements of adjudication, including ... [t]he right on behalf of a party to present evidence and legal argument in support of that party's contention and fair opportunity to rebut evidence and argument by opposing parties" (quoting Restatement of Judgments 2d, § 83)).

The extent of the Prior Arbitration Award's determination on the issue of successor/assignee liability is the one sentence statement that Gruntal is liable "as successor to Philips." Steinberg Response, Ex. A at 2. No legal or factual authority is cited as support for this sweeping statement. *See id.* In light of the broad, somewhat vague terms of this determination, it is difficult to conclude that the issue currently before the court was "'distinctly put in issue' and 'directly determined'" in the Prior Arbitration Proceedings. *New Jersey–Philadelphia Presbytery,* 654 F.2d at 876.

It appears, moreover, that the Prior Arbitration Award was never judicially confirmed. *See* Nathan Cert., Ex. F; Steinberg Reply Brief at 5. Therefore, it appears the Prior Arbitration Proceedings did not result in a final judgment, as is required for the application of issue preclusion.[18] *See Centra,*

---

18. The law of Maryland, where the Prior Arbitra- tion Proceedings took place, provides that a judg-

983 F.2d at 505. Other courts have refused to accord unconfirmed arbitration awards issue preclusive effect for similar reasons. *See Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 385 (2d Cir.1989) ("[I]t is the *judgment* entered on an arbitration award that is given preclusive effect in subsequent litigation. An arbitration award that is not filed and confirmed in an appropriate court is without effect."); *Scott v. Snelling and Snelling, Inc.*, 732 F.Supp. 1034, 1039 (N.D.Cal.1990) ("Here, the award of the arbitrator ... has apparently not been confirmed by either a [F]ederal or state court. Hence, it does not constitute a final judgment for [issue preclusion] purposes."); *see also Singer Co. v. Tappan Co.*, 593 F.2d 545, 549 (3d Cir.1979) ("The final judgment confirming the award therefore properly forecloses future litigation. . . ."). Accordingly, based upon the present record, the Prior Arbitration Award will not be accorded issue preclusive effect over the instant proceedings.

Because the Steinbergs have not established the absence of a genuine issue of material fact that Gruntal is the successor to or assignee of the Steinberg–Philips Agreement, they are not entitled to summary judgment on that theory.

### 2. *The NASD Code of Arbitration Procedure*

 As stated, the Steinbergs cite the NASD Code of Arbitration Procedure as a second basis for Gruntal's obligation to arbitrate. Steinberg Reply Brief at 3. The possibility that Gruntal would be obligated to arbitrate by virtue of the NASD Code of Arbitration Procedure was addressed and disposed of in *Gruntal I.* *See* 837 F.Supp. at 91–92. While the parties have submitted no argument which warrants the revisitation of that holding here, the issue will be discussed again briefly.

It is recognized that the rules and regulations of self regulatory organizations such as the NASD "are sufficient in and of themselves to compel arbitration of *covered disputes* . . . , whether or not they are incorpo-

rated in a purchase or sale agreement." *Paine, Webber, Jackson & Curtis v. Chase Manhattan Bank, N.A.*, 728 F.2d 577, 580 (2d Cir.1984) (emphasis added) (addressing arbitration rules of New York Stock Exchange); *see Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400, 406 (3d Cir.1987) (Customer of broker-dealer "can demand arbitration of its disputes with [broker-dealer] by virtue of § 12(a) [of the NASD Code of Arbitration Procedure], and [broker dealer] is compelled to submit even absent a specific contractual arbitration undertaking directly with [customer]."); *Scobee Combs Funeral Home, Inc. v. E.F. Hutton & Co.*, 711 F.Supp. 605, 608 (S.D.Fla.1989) (same). Even so, in order for Gruntal's NASD membership to provide a basis to compel arbitration here, the instant dispute must be covered by the NASD Code of Arbitration Procedure. *See Paine, Webber*, 728 F.2d at 580.

The NASD Code of Arbitration Procedure states in relevant part:

> Sec. 1. This Code of Arbitration Procedure is prescribed and adopted ... for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the [NASD]. . . .
>
> (2) between or among members and public customers, or others. . . .
>
> Sec. 12(a) Any dispute, claim or controversy eligible for submission under Part I of this Code between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this code. . . .

NASD Code of Arbitration Procedure, *reprinted in* NASD Manual (CCH) 3711, 3713.

It has been recognized that "these sections contain two prerequisites before an NASD member can be compelled to arbitrate. First, a complaining party must be a 'customer' of the NASD member, and second, the 'dispute, claim or controversy' must have

---

ment in an arbitration proceeding shall issue "[i]f an order, confirming, modifying or correcting an award is granted. . . ." Md.Code Anno.

Courts and Judicial Proceedings, § 3–228. Such "judgment may be enforced as any other judgment." *Id.*

arisen 'in connection with the business of such member.'" *Wheat,* 993 F.2d at 820; *cf. Patten Securities,* 819 F.2d at 406 (NASD Code of Arbitration Procedure § 12(a) provided basis for arbitration because claimant was "customer" of broker dealer). It has further been recognized that "customer status for the purposes of the 'customer' requirement of NASD Code [of Arbitration Procedure] §§ 1 and 12(a) must be determined as of the time of the events providing the basis for the allegations of fraud."[19] *Wheat,* 993 F.2d at 820.

Applying these principles to the present facts of this case, it appears that where the Arbitration Proceedings are concerned, there is at least a genuine issue of material fact as to whether the Steinbergs are 'customers' of Gruntal for the purposes of the NASD Code of Arbitration Procedure. The acts of fraud which are the subject of the Arbitration Proceedings took place, in their entireties, at least two months before the Steinbergs became customers of Gruntal. *See* Complaint, Ex. B. Because these acts were committed when the Steinbergs were not customers of Gruntal, it may be that Gruntal cannot be compelled to arbitrate with the Steinbergs by virtue of the NASD Code of Arbitration Procedure. *See Wheat,* 993 F.2d at 820. Moreover, it appears the claims at issue in the Arbitration Proceedings did not arise "in connection with the business of" Gruntal, as is required by the NASD Code of Arbitration Procedure. *See* Complaint, Ex. B.; *Wheat,* 993 F.2d at 820. Therefore, there is at least a genuine issue of material fact as to whether Gruntal's membership in the NASD will compel it to arbitrate with the Steinbergs on the claims presented in the Arbitration Proceedings.

The Steinbergs have not established the absence of a genuine issue of material fact that Gruntal is obligated to arbitrate in the Arbitration Proceedings. Accordingly, the Steinbergs' motion for summary judgment is denied.

### C. The Status of the Preliminary Injunction

A question remains as to the status of the Preliminary Injunction. As stated in *Gruntal I,* to prevail on its application for a preliminary injunction, the moving party must show:

(1) the probability of irreparable injury to the moving party in the absence of relief; (2) the [absence of] a possibility of harm to the non-moving party if relief were granted; (3) the likelihood of success on the merits; and (4) the public interest [in granting preliminary relief].

*Alessi v. Pennsylvania, Dept. of Pub. Welfare,* 893 F.2d 1444, 1447 (3d Cir.1990); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992); *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.,* 963 F.2d 628, 632 (3d Cir.1992); *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 191–92 (3d Cir.1990); *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989); *Fechter v. HMW Indus., Inc.,* 879 F.2d 1111, 1116 (3d Cir. 1989); *Apollo Technologies Corp. v. Centrosphere Industrial Corp.,* 805 F.Supp. 1157, 1191 (D.N.J.1992); *Glenside West Corp. v. Exxon Co., U.S.A.,* 761 F.Supp. 1118, 1132 (D.N.J.1991); *CPC Int'l, Inc. v. Caribe Food Distrib.,* 731 F.Supp. 660, 664 (D.N.J.1990); *Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.,* 715 F.Supp. 616, 624 (D.N.J. 1989).

Of these four requirements, the Circuit has placed particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 197 (3d Cir.1990) (quoting *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982)); *see also Instant*

---

**19.** In *Wheat,* the Eleventh Circuit addressed the issue of 'customer' status under the NASD Code of Arbitration Procedure separately from the issue of successor liability. *See* 993 F.2d at 820–21. Therefore, it appears 'customer' status is to be determined "at the time of the events providing the basis for the allegations of fraud," notwithstanding successor relationships. *See id.* In any event, as stated, the Steinbergs have failed to establish the absence of a genuine issue of material fact that a successor relationship exists between Philips and Gruntal.

*Air,* 882 F.2d at 800; *Morton v. Beyer,* 822 F.2d 364, 367 (3d Cir.1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 151 (3d Cir.1984).

Significantly, the Circuit has repeatedly stated that a "grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988); *accord Chez Sez III Corp. v. Union,* 945 F.2d 628, 634 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Instant Air,* 882 F.2d at 800; *United States v. Philadelphia,* 644 F.2d 187, 191 n. 1 (3d Cir.1980); *see also Driscoll Potatoes, Inc. v. N.A. Produce Co.,* 765 F.Supp. 174, 176 (D.N.J.1991).

As indicated, parties seeking injunctive relief must make a preliminary showing that they are likely to succeed on the merits of their claims. This requirement is satisfied if the moving party "make[s] a showing of a reasonable probability, not the certainty, of success on the merits." *SK & F Co. v. Premo Pharmaceutical Labs., Inc.,* 625 F.2d 1055, 1066–67 (3d Cir.1980) (citations omitted). Nevertheless, "[a] preliminary injunction cannot be issued when there are disputed issues of fact." *Hunterdon Transformer Co. v. Cook,* 1990 WL 10342 at *2 (D.N.J. 1990) (citing *Charles Simkin & Sons, Inc. v. Massiah,* 289 F.2d 26, 29 (3d Cir.1961)); *see also Oxford House–Evergreen v. Plainfield,* 769 F.Supp. 1329, 1342–43 (D.N.J.1991).

In *Gruntal I,* it was held that Gruntal had established a reasonable probability that it would be declared free from obligation to arbitrate in the Arbitration Proceedings. *See* 837 F.Supp. at 92. However, as set forth above, the facts now at bar place that conclusion in doubt. Specifically, facts have been brought forth by the Steinbergs suggesting that Gruntal may be obligated to arbitrate with the Steinbergs as the successor to or assignee of the Steinberg–Philips Contract. These facts are of sufficient weight to controvert Gruntal's showing of likelihood of success in connection with its application for the Preliminary Injunction. *See Hunterdon Transformer Co.,* 1990 WL 10342 at *2. Because the Preliminary Injunction cannot be sustained unless Gruntal is reasonably likely to succeed on the merits of the Complaint, the Preliminary Injunction must be vacated.

*Conclusion*

For the reasons set forth above, both Gruntal's motion for summary judgment permanently enjoining arbitration and the Steinbergs' motion for summary judgment declaring Gruntal obligated to arbitrate are denied. However, for good cause shown by the Steinbergs, the Preliminary Injunction is vacated.